Thomas DENNEY, on his own behalf and on behalf of all others similarly situated, R. Thomas Weeks, on his own behalf and on behalf of all others similarly situated, Norman R. Kirisits, on his own behalf and on behalf of all others similarly situated, TD Cody Investments, L.L.C., on their own behalf and on behalf of all others similarly situated, RTW High Investments, L.L.C., on their own behalf and on behalf of all others similarly situated, NRK Syracuse Investments, L.L.C., on their own behalf and on behalf of all others similarly situated, DKW Partners, on their own behalf and on behalf of all others similarly situated, DKW Lockport Investors, Inc., on their own behalf and on behalf of all others similarly situated, Donald A. Destefano, on his own behalf and on behalf of all others similarly situated, Patricia J. Destefano, on her own be-

half and on behalf of all others similarly situated, DD Tiffany Circle Investments, L.L.C., on their own behalf and on behalf of all others similarly situated, Tiffany Circle Partners, on their own behalf and on behalf of all others similarly situated, Diamond Roofing Company, Inc., on their own behalf and on behalf of all others similarly situated, Kathryn M. Kirisits, on her own behalf and on behalf of all others similarly situated, Jeff Blumin, JB Hilltop Investments LLC, Kyle Blumin, KB Hoag Lane Investments LLC, Michael Blumin, MB St. Andrews Investments LLC, Fayetteville Partner and Laurel Hollow Investors, Inc., on their own behalf and on behalf of all others similarly situated, Plaintiffs–Appellees,

v.

BDO SEIDMAN, L.L.P., Pasquale & Bowers, L.L.P., Dermody, Burke and Brown, Certified Public Accountants, PLLC, Paul Shanbrom, Deutsche Bank AG and Deutsche Bank Securities, Inc., doing business as Deutsche Bank Alex Brown, a division of Deutsche Bank Securities, Inc., Defendants–Appellants,

Jenkens & Gilchrist, a Texas Professional Corporation, Jenkens & Gilchrist, an Illinois Professional Corporation, Cantley & Sedacca, L.L.P., Paul M. Daugerdas, and Edward Sedacca, Defendants.

Docket Nos. 04–2654–CV(L), 04–2659–CV(CON), 04–2705–CV(CON), 04–2808–CV(CON).

United States Court of Appeals, Second Circuit.

Argued: Feb. 22, 2005.

Decided: June 14, 2005.

Michael R. Young (Michelle J. Nadel and I. Bennett Capers, of counsel), Willkie Farr & Gallagher LLP, New York, N.Y. for Defendants–Appellants BDO Seidman, LLP and Paul Shanbrom.

Seth C. Farber (Lawrence M. Hill, of counsel), Dewey Ballantine LLP, New York, N.Y. for Defendants–Appellants Deutsche Bank AG and Deutsche Bank Securities, Inc., doing business as Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities Inc.

W. Ralph Canada, Jr. (David R. Deary, Jeven R. Sloan, Deary Montgomery De-Feo & Canada, LLP, Dallas, TX, Jeffrey H. Daichman, Kane Kessler P.C., New York, NY, Ernest Cory, Cory, Watson, Crowder & Degaris, Birmingham, AL, Joe Whatley and Othni Lathram, Whatleydrake, L.L.C., Birmingham, AL, of counsel), Deary Montgomery DeFeo & Canada, LLP, Dallas, TX for Plaintiffs–Appellees.

Before: LEVAL, CABRANES and KATZMANN, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

Defendants-appellants appeal from an order of the United States District Court for the Southern District of New York (Shira A. Scheindlin, *Judge*) denying their motion to compel arbitration based on the District Court's finding that the consulting agreements the parties entered into, each of which contained an arbitration clause, were "mutually fraudulent" and consequently unenforceable. Because we hold that the District Court erred in finding the agreements mutually fraudulent, we reverse the District Court's finding that the consulting agreements are void because of

mutual fraud. We reverse also the District Court's finding that the services provided to plaintiffs by defendant BDO Seidman, L.L.P. ("BDO"), that form the basis for this suit, fell outside the scope of the consulting agreements. Finally, we vacate the District Court's order denying defendants' motion to compel plaintiffs to arbitrate their claims and remand the cause for further consideration, consistent with this opinion, of (1) whether the non-signatory defendants can compel arbitration, and (2) whether the non-signatory plaintiffs can be compelled to submit to arbitration.

## BACKGROUND

The full history of this case is reported in the order of the District Court. *See Denney v. Jenkens & Gilchrist,* 340 F.Supp.2d 338 (S.D.N.Y.2004) (*"Denney I"*). We recount here only those facts relevant to the disposition of this appeal.

In this putative class action, plaintiffs [1] seek damages from defendants [2] for alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"), unjust enrichment, breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duties, fraud, negligent misrepresentation, professional malpractice, "unethical, excessive and illegal fees," and civil conspiracy. *See Denney I,* 340 F.Supp.2d at 340.

Plaintiffs claim that they were recruited by accounting firms BDO, Pasquale & Bowers, L.L.P., and Dermody, Burke, and Brown, Certified Public Accountants, in 1999 to participate in a tax scheme, Currency Options Bring Reward Alternatives ("COBRA"). *Id.* at 341. At that time, plaintiffs were expecting to realize substantial capital gains from certain stock holdings. Defendants told plaintiffs that they could offset such gains, and thereby reduce their taxes, by forming partnerships to engage in digital foreign currency option transactions.[3] *Id.* Defendants assured plaintiffs that COBRA was a lawful tax strategy and that they had an independent opinion letter from Jenkens & Gilchrist, a major law firm, attesting to COBRA's validity.

In the fall of 1999, plaintiffs agreed to engage in COBRA transactions and separately entered into consulting agreements

1. Plaintiffs, acting on behalf of themselves and all others similarly situated, include: Thomas Denney, R. Thomas Weeks, Norman R. Kirisits, Kathryn M. Kirisits, NRK Syracuse Investments, L.L.C., RTW High Investments, L.L.C., TD Cody Investments, L.L.C., DKW Lockport Investors, Inc., DKW Partners (collectively, the "Denney Plaintiffs"), Donald A. DeStefano, Patricia J. DeStefano, DD Tiffany Circle Investments, L.L.C., Tiffany Circle Partners, Diamond Roofing Company Inc. (collectively, the "DeStefano Plaintiffs"), Jeff Blumin, Kyle Blumin, L. Michael Blumin, JB Hilltop Investments L.L.C., KB Hoag Lane Investments, L.L.C., MB St. Andrews Investments L.L.C., Fayetteville Partner, and Laurel Hollow Investors, Inc. (collectively, the "Blumin Plaintiffs").

2. Defendants include: Jenkens & Gilchrist, a Texas Professional Corporation, Jenkens & Gilchrist, an Illinois Professional Corporation, Paul M. Daugerdas (collectively, the "Jenkens Defendants"), BDO Seidman, L.L.P. ("BDO"), Paul Shanbrom (collectively, the "BDO Defendants"), Pasquale & Bowers, L.L.P., Dermody, Burke, and Brown, Certified Public Accountants (collectively, the "Pasquale Defendants"), Cantley & Sedacca, L.L.P., Edward Sedacca (collectively, the "Cantley Defendants"), Deutsche Bank AG, and Deutsche Bank Securities, Inc. (collectively, the "Deutsche Bank Defendants").

3. A digital foreign currency option is an all-or-nothing option, which pays a fixed amount when the optioned currency falls below (or exceeds) a preset strike price. *See* Am. Compl. ¶ 50 ("Digital Options are, in reality, nothing more than wagers that a certain commodity or equity price will be at or beyond (or beneath) a given price on a certain date.").

with BDO to memorialize that arrangement.[4] *Id.* at 341, 343–45. In October 1999, plaintiff L. Michael Blumin, acting on behalf of Jefyle Equipment Corporation, entered into a consulting agreement with BDO (the "Blumin Agreement"). Under the Blumin Agreement, BDO was to provide "certain tax, financing and business consulting services" in connection with the expansion of Jefyle Equipment Corporation's "business operations into new strategic markets."

Plaintiffs Thomas Denney, R. Thomas Weeks, and Norman R. Kirisits entered into a similar consulting agreement with BDO that same month for consulting services in connection with the transfer, "by sale, lease or otherwise," of their business operations (the "Denney Agreement"). Under the Denney Agreement, BDO was required to provide "consulting services in conjunction with [Denney, Weeks, and Kirisits's transfer of business operations], including assistance in structuring the Transaction, assisting the client in determining a tax treatment for the Transaction, and [preparing] the 1999 and 2000 income tax returns that would reflect the Transaction."

Subsequently, in November 1999, plaintiff Diamond Roofing Company likewise entered into an agreement with BDO for consulting services in connection with the expansion of its "business operations into new strategic markets" (the "DeStefano Agreement"). The services that BDO agreed to provide under the DeStefano Agreement were identical to those it agreed to provide under the Blumin Agreement. *See id.* at 345.

Each of these three consulting agreements also contained the following mandatory arbitration clause:

> If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of New York, and the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association ("AAA") except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel, and shall take place in the city in which the BDO office providing the relevant Services exists, unless the parties agree to a different locale.

*Id.* at 344–45.

Plaintiffs claimed that their COBRA transactions generated losses. *See id.* at 342. The Pasquale and BDO defendants prepared plaintiffs' tax returns, utilizing these losses to offset plaintiffs' capital gains. *Id.* Plaintiffs contend that, at the time defendants prepared plaintiffs' returns, defendants knew, or should have known, that the COBRA transactions were "wholly lacking in economic substance [and were] not properly allowable for Federal income tax purposes."

In or around December 2002, the New York State Revenue Department and the Internal Revenue Service separately notified plaintiffs that their income tax returns had been selected for audit. *Id.* at 342. On July 23, 2003, plaintiffs filed this suit in the District Court, seeking damages from de-

---

4. Plaintiffs also retained Jenkens & Gilchrist—the law firm that had devised the COBRA tax strategy—to advise them on their COBRA transactions. Jenkens & Gilchrist in turn referred plaintiffs to the Deutsche Bank defendants, who counseled plaintiffs with respect to COBRA and carried out the COBRA transactions on plaintiffs' behalf.

fendants for defendants' design, promotion, sale, and implementation of the COBRA strategy. Specifically, plaintiffs claimed that they were duped into participating in COBRA by defendants and that, in addition to losses directly associated with the COBRA transactions, they have incurred, and will continue to incur, substantial damages in the form of fees paid to accountants and attorneys in connection with the ongoing state and federal audits. *See id.* at 343.

On January 9, 2004, defendants moved in the District Court to dismiss the suit and compel plaintiffs to arbitrate their claims under the consulting agreements. Although only BDO and certain named plaintiffs were parties to the agreements, the other named defendants urged that arbitration of plaintiffs' claims against them was likewise appropriate because their relationship with plaintiffs was intertwined with BDO's. Defendants further averred that those plaintiffs who had not signed consulting agreements with BDO should be compelled to arbitrate their claims alongside the signatory plaintiffs because all plaintiffs directly benefitted from the services provided pursuant to the consulting agreements.

In a telephone conference initiated by the District Court on April 14, 2004, with counsel for BDO and counsel for plaintiffs, the Court asked counsel to clarify what the parties believed they were contracting for when they signed the consulting agreements. Specifically, the Court inquired whether the language in the agreements was "a cover or a code for what they knew was the [COBRA] tax shelter." Plaintiffs' counsel acquiesced to the District Court's characterization and described the agreements as "some kind of trick." In response, BDO's counsel urged only that discovery as to the parties' intent was unnecessary and that any services BDO performed with respect to the COBRA transactions were pursuant to the consulting agreements.

On the basis of this telephone conference, the District Court noted in an Opinion and Order dated April 30, 2004, that, according to representations made by plaintiffs and BDO's counsel, the tax shelter services provided by defendants had " 'nothing to do with' " the transaction at the heart of the consulting agreement, and that the agreement was drawn up as a " 'trick' " to prevent third parties from discovering the true nature of the consulting relationship between plaintiffs and BDO. *Id.* at 346 (quoting plaintiffs' counsel). These asserted representations, coupled with what the Court described as the "extraordinarily vague language" of the consulting agreements, led the Court to conclude that the contracts were "mutually fraudulent" and consequently unenforceable. *Id.* at 346–47 & n. 9. Accordingly, the District Court denied defendants' motion to compel arbitration. Shortly thereafter, on May 19, 2004, the Jenkens defendants settled with plaintiffs.

In a separate opinion dated June 14, 2004, the District Court granted the BDO, Pasquale, and Deutsche Bank defendants' motions to stay the lower court proceedings pending appeal. *Denney v. Jenkens & Gilchrist*, 340 F.Supp.2d 348, 353 (S.D.N.Y.2004) (*"Denney II"*). In doing so, the District Court made additional factual findings. Specifically, the District Court found that, although the "language of the arbitration clauses [in the consulting agreements] is broad because it covers 'any dispute, controversy or claim [that] arises in connection with the performance of breach of this Agreement,' " plaintiffs' dispute was still "not subject to arbitration because plaintiffs' allegations *do not arise in connection with the performance or breach of the contracts." Id.* at 352 (em-

phasis in original). The District Court nevertheless granted the stay because, as the District Court noted, "when a party appeals an order denying a motion to compel arbitration, the district court should stay the action pending appeal." *Id.* at 349.

Notwithstanding the above, on November 23, 2004, the District Court vacated the stay that it had entered on June 14. Specifically, in a separate Opinion and Order, the Court considered a memorandum written by BDO partner Michael Kerekes to BDO's outside counsel on August 11, 2000 (the "Kerekes Memorandum") that questioned the validity of the COBRA tax strategy and stated that BDO's "engagement letters have been structured not to make clear what services [BDO was] providing in return for [its] fee." *Denney v. Jenkens & Gilchrist,* 362 F.Supp.2d 407, 418 (S.D.N.Y.2004) (*"Denney III "*). Based on its conclusion that "whatever privilege that might have once attached to the memo has been waived," the District Court declined to find that the memorandum was a privileged attorney-client communication.[5] *Id.* at 412. In part because the Kerekes Memorandum [6] purportedly confirmed the Court's prior finding that the consulting agreements were mutually fraudulent, the Court no longer thought it likely that defendants would prevail on appeal. *Id.* at 418 ("The Kerekes Memorandum . . . clearly supports my conclusion that the contracts are mutually fraudulent, and that the arbitration clauses do not

cover the disputes."). For these reasons, the Court vacated the stay.

In a subsequent Opinion and Order dated December 27, 2004, the District Court denied defendants' request that the Court certify for interlocutory appeal its finding that the Kerekes Memorandum was not privileged. *See Denney v. Jenkens & Gilchrist,* No. 03 Civ. 5460, 2004 WL 2997930 (S.D.N.Y. Dec. 27, 2004). That same day, the BDO and Deutsche Bank defendants filed emergency motions in this Court seeking a stay of the district court proceedings pending appeal. We granted their motions on December 30, 2004.

On January 11, 2005, the Pasquale defendants notified us of their court-approved settlement with plaintiffs. As a result, only the BDO and Deutsche Bank defendants seek reversal of the District Court's order in this appeal.

## DISCUSSION

We review the District Court's legal determination that the parties have not bound themselves to arbitrate their claims *de novo* and the District Court's predicate factual findings for clear error. *See Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.,* 189 F.3d 289, 295 (2d Cir.1999).

The District Court's finding that plaintiffs were not required to arbitrate their claims was error as to both fact and law. Specifically, the District Court's factual

---

**5.** In so finding, the District Court's order noted that two other district courts had already concluded that the Kerekes Memorandum was a privileged attorney-client communication, but it gave no particular weight to that fact. *See Miron v. BDO Seidman, LLP,* No. 04 Civ. 968, 2004 U.S. Dist. LEXIS 22101, at *11 (E.D.Pa. Oct. 21, 2004); *United States v. BDO Seidman, LLP,* No. 02 C 4822, 2004 WL 1470034, at *3 (N.D.Ill. June 29, 2004).

**6.** After settling with Jenkens & Gilchrist, plaintiffs obtained the Kerekes Memorandum from the Jenkens defendants. *See Denney III,* 362 F.Supp.2d at 409–10. Arguing that the memorandum constituted newly discovered evidence, plaintiffs submitted the Kerekes Memorandum to the District Court as an exhibit to their October 21, 2004, motion to lift the stay the District Court had entered in its order of June 14, 2004. *See id.* at 409 n. 1; BDO Mot. for Stay Pending Appeal at 4.

finding that the parties represented to the Court that they deliberately mischaracterized their business relationship in their consulting agreements in order to conceal the nature of the COBRA transactions is clearly erroneous because it is simply not supported by the record. The District Court's legal conclusion—that plaintiffs may avoid arbitration because the consulting agreements were mutually fraudulent—fails to take into account controlling law in this Circuit, which indicates that where an arbitration provision is severable from the contract in which it is embedded, arbitration provisions may indeed be enforceable even if aspects of the underlying agreements are not. The District Court also erred in concluding that plaintiffs' claims against BDO were not governed by the consulting agreements' broad arbitration provisions. We therefore vacate the District Court's order denying defendants' motion to compel plaintiffs to arbitrate their claims and remand the cause for further consideration, consistent with this opinion, of (1) whether the non-signatory defendants can compel arbitration, and (2) whether the non-signatory plaintiffs can be compelled to submit to arbitration.

## I. "Mutual Fraud"

### a. Factual Findings

The District Court stated in its Opinion and Memorandum of April 30, 2004, that

its finding of mutual fraud was based on "representations by counsel for plaintiffs *and BDO*, as well as the extraordinarily vague language contained in the consulting agreements." *Denney I*, 340 F.Supp.2d at 346 (emphasis added). The "representations" upon which the Court apparently relied were *plaintiffs'* counsel's eager and obliging response to the District Court's question of whether the consulting agreement was a "sort of a cover." Plaintiffs' counsel said, "[W]e don't know any more than you do in the sense of looking at these agreements, they appear to be some kind of trick and in the sense of I think the use of the word 'cover' may well be appropriate in reality."[7]

Defense counsel, however, did not acquiesce to the District Court's characterization of the parties' conduct.[8] In response to the Court's questions, defense counsel asserted only that any services BDO performed on plaintiffs' behalf were pursuant to the consulting agreements. Because nothing in the record supports the District Court's finding that BDO counsel represented to the Court that the parties' intentions were mutually fraudulent, the finding is clearly erroneous. *See, e.g., Krizek v. Cigna Group Ins.*, 345 F.3d 91, 100 (2d Cir.2003) (holding a district court's factual findings to be clearly erroneous where

---

7. Although plaintiffs' counsel expressed some agreement with the District Court's characterization of the parties' intentions, plaintiffs' complaint does not allege that the consulting agreements were mutually fraudulent. Rather, plaintiffs claim they were duped into thinking that the COBRA transactions were legitimate. This position cannot readily be reconciled with the District Court's conclusion that the parties acted in concert.

8. The District Court noted that during the teleconference, the Court "expressed a tentative view that these contracts were mutually fraudulent. 'The point is both sides were in on the wink and the nod.' Later, [the Court]

said, 'You are sort of saying it is a fraud and both sides knew it.' Tellingly, neither party disagreed with these statements." *Denney I*, 340 F.Supp.2d at 347, n. 9 (citations to transcript omitted). We disagree with the District Court's conclusion that a lawyer's failure clearly to negate a district judge's unexpected and assertive characterizations, or failure to respond to opposing counsel's ready acquiescence to those characterizations, necessarily constitutes an admission that the judge's characterization is correct, especially where the purported agreement is a concession that the attorney's client acted fraudulently.

the "record [was] simply devoid of any basis for the [district court's] conclusion").

■ In the absence of any concession by defendants that the agreement was fraudulent, the Court's alternative reliance on the "extraordinarily vague language" of the contract is insufficient to support a finding of mutual fraud. Neither the District Court nor plaintiffs have cited any authority for the proposition that the use of broad language in a contract likely, much less necessarily, signifies a fraudulent intent. Furthermore, BDO has plausibly explained the use of such language in the agreements, noting that this was BDO's standard form and that the parties "used generalized language to capture the full breadth of the services." [9] See Jeffries v. Ross, 238 A.D.2d 288, 657 N.Y.S.2d 29, 30 (1st Dep't 1997) (compelling arbitration despite the petitioner's contention that the underlying contract was too vague to be enforceable where the intent to arbitrate was "clear and unequivocal").

In any case, the text of the consulting agreements at issue here does not support a finding of mutual fraud. The consulting agreements state that BDO was to provide "certain tax, financing and business con-

sulting services" to plaintiffs and that BDO would assist plaintiffs in determining a tax treatments for certain transactions. This "may not have been exactly what the district court would have liked," BDO Appellants' Br. at 19–20, but the stand-alone language does not support the District Court's conclusion that the contractual provisions, by their terms, were fraudulent.

Because (1) no fraud is apparent on the face of the consulting agreements, (2) the parties have disavowed the District Court's finding of mutual fraud, (3) the parties do not seek further discovery or an evidentiary hearing on whether there was mutual fraud,[10] and (4) there is no basis in the record for a finding of mutual fraud, or, for that matter, for exploring the issue further, we conclude that reversal, not vacatur, of the District Court's finding of mutual fraud is warranted.

### b. Legal Conclusions

In finding that an arbitration provision is rendered unenforceable in instances where the underlying agreement is the product of mutual fraud, the District Court principally relied on Gardenier v. Tubbs,

---

9. It bears noting that, in another case against BDO concerning the COBRA transactions, the United States District Court for the Eastern District of Pennsylvania granted BDO's motion to compel arbitration where the consulting agreement at issue contained similar language regarding the services to be rendered and an identical arbitration provision. See Miron v. BDO Seidman, L.L.P., 342 F.Supp.2d 324, 327–29 (E.D.Pa.2004).

10. Although at oral argument before us, plaintiffs rejected the District Court's finding that they acted fraudulently, plaintiffs argue on appeal that an evidentiary hearing may be necessary if and to the extent that we reject the District Court's finding that the arbitration provisions were void. However, in their brief to this Court, plaintiffs' suggestion of a remand to further develop the record is sup-

ported only by their contention that BDO acted fraudulently in drafting the contract (and not by any concession that plaintiffs were "in on the wink and the nod"). To the extent that plaintiffs continue to allege, as they did in their Complaint, that defendants were guilty only of fraud in the inducement, they cannot defeat defendants' motion to compel arbitration. Indeed, plaintiffs' claim of fraud in the inducement is itself, by the terms of the consulting agreements, subject to arbitration. See ACE Capital Re Overseas Ltd. v. Cent. United Life. Ins. Co., 307 F.3d 24, 29 (2d Cir.2002) ("It is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself, may be subject to arbitration.").

21 Wend. 169, 171 (N.Y.Sup.Ct.1839),[11] and *Jackson v. Ashton*, 36 U.S. (11 Pet.) 229, 239, 9 L.Ed. 698 (1837),[12] *see Denney I*, 340 F.Supp.2d at 347, neither of which provides persuasive support for the District Court's conclusion, and both of which predate the 1925 passage of the Federal Arbitration Act by more than eighty years.[13] These cases do not reflect the current state of the law in this area. *See Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 410 (2d Cir.1959) (noting that "since the [1925] passage of the Arbitration Act, the courts have … held that the illegality of part of the contract does not operate to nullify an agreement to arbitrate").

■ Although the District Court did not refer to it, our decision in *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir.2001), governs the question of whether a void or voidable contract containing an arbitration provision is subject to arbitration. In *Sphere Drake*, we held that, consistent with the Supreme Court's ruling in *Prima Paint Corp. v.* *Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), "arbitration clauses as a matter of federal law are separable from the contracts in which they are embedded" so that "a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud." *Sphere Drake*, 263 F.3d at 31 (quoting *Prima Paint*, 388 U.S. at 402, 87 S.Ct. 1801 (quotation marks omitted)).

■ In so holding, we distinguished contracts that were "void" (because, for example, the parties failed to agree to essential contract terms), from those that were merely "voidable" (for example, because of fraud in the inducement). *Id.* A party alleging that a contract is void may be entitled to a trial prior to arbitration, *id.* at 32, whereas "a party merely alleg[ing] that a contract is voidable," who does not further allege that the arbitration clause itself is voidable, will be compelled to arbitrate the dispute, *id; see also Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir.1972) ("To

**11.** In *Gardenier,* the New York Supreme Court of Judicature considered the enforceability of a sale executed with the intent of defrauding the sellers' creditors and asserted a general rule that fraudulent conveyances would not be enforced to the detriment of creditors. *See Gardenier,* 21 Wend. at 171 ("[The law] will neither enforce nor annul a contract mutually fraudulent.").

**12.** The District Court's reliance on the United States Supreme Court's ruling in *Jackson* is misplaced. The reference in *Jackson* to mutual fraud was made by counsel for defendant, not the Supreme Court, and in any case, counsel argued that "[f]raud will vitiate any contract, *unless* it be mutual fraud." *Jackson,* 36 U.S. at 239, 9 L.Ed. 698 (emphasis added). That said, *Jackson* involved the application of a species of "federal common law" that is no longer regarded as having been a proper exercise of federal judicial power. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 77–78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), *rev'g Swift v. Ty-*

son, 41 U.S. (16 Pet.) 1, 18–19, 10 L.Ed. 865 (1842); *see also Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1078 n. 10 (5th Cir.1997) (noting, but declining to rely on, legal doctrine that "evolved in the pre-*Erie* world").

**13.** The District Court also relied on a 1933 jurisprudential essay in the *Harvard Law Review* by the eminent legal philosopher Morris Raphael Cohen, *see Denney I,* 340 F.Supp.2d at 347, which, in the course of investigating "the nature of contract," and the rationale for governments to enforce contracts, remarks that an enforceable contract between two people "cannot be said to be generally devoid of all public interest," or there would be no reason for government to enforce it, *see* Morris R. Cohen, *The Basis of Contract,* 46 Harv. L.Rev. 553, 562 (1933). Nothing in this essay directly supports, much less compels, the conclusion that the arbitration provisions at issue in this case are unenforceable.

make a genuine issue entitling the plaintiff to a trial by jury, an unequivocal denial that the agreement had been made was needed, and some evidence should have been produced to substantiate the denial.") (quoting *Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir.1945)); *cf. Burden v. Check into Cash of Ky., LLC*, 267 F.3d 483, 489 (6th Cir.2001) ("[T]he sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents renders a contract void, while fraud in the inducement renders a contract voidable." (quotation marks and citations omitted)).

We have not previously addressed the specific question of whether an arbitration provision remains enforceable where the underlying agreement is found to be mutually fraudulent. The only published New York cases which invoke the mutual fraud doctrine suggest that a mutually fraudulent agreement—one by which parties seek jointly to transfer assets to hide them from creditors or potential creditors, or generally to defraud third parties—is void (as opposed to merely voidable). *See Smith v. White*, 7 N.Y.S. 373, 375, 27 N.Y.St.Rep. 227 (N.Y. Gen. Term 1889) ("[T]he assignment, by reason of the mutual fraud of the parties to it, was of no validity or effect."); *Gardenier*, 21 Wend. at 171 ("[T]he law never will recognize [mutual fraud] as a ground of relief, either one way or the other, as between the parties to it. It will neither enforce nor annul a contract mutually fraudulent.").

 Yet the reasoning underlying our ruling in *Sphere Drake*, which seeks to protect parties from arbitration only in those narrowly-limited circumstances where the very existence of a contract is in doubt, does not apply with equal force to situations where the parties have engaged in mutual fraud. *Cf. Snowden v. Check-Point Check Cashing*, 290 F.3d 631, 636–37

(4th Cir.2002) (compelling arbitration—over the plaintiff's objection that the contract was void *ab initio* under Maryland law for imposition of a usurious rate of interest—because the plaintiff did not raise the validity of the arbitration provision or contend that he "never assented in the first place to the contract containing the arbitration provision"). We may not compel a party to arbitrate a dispute where there is a genuine issue as to whether the non-moving party actually agreed to arbitrate. *Cf. Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 106–10 (3d Cir.2000) (holding that the reviewing court must determine whether signatory had power to bind company before compelling arbitration); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140–41 (9th Cir.1991) (same). But here it is indisputable that the signatories to the consulting agreements agreed to arbitrate and that they had the authority to do so. Accordingly, we are skeptical of plaintiffs' contention that they should not be bound by an otherwise valid arbitration provision because of their (disputed) claim that they and their counterparts acted fraudulently.

We need not decide this issue, however, because here any finding that the consulting agreements were part of an effort to hide assets from creditors or defraud third parties is clearly erroneous. At best, the facts *might* support a conclusion that the parties intentionally drafted the contract to prevent third parties from understanding the transactions to which the consulting agreements were referring. We hold that, in the absence of any further evidence that a contract is illegal or seriously contrary to public policy, such a factual finding does not suffice to render an entire contract void, and an arbitration agreement unenforceable, under *Sphere Drake*.

## II. The Scope of the Agreements

 We have recognized that because of the "strong federal policy favoring arbitra-

tion ... doubts as to whether a claim falls within the scope of [the] agreement should be resolved in favor of arbitrability." *ACE Capital Re Overseas Ltd. v. Cent. United Life. Ins. Co.,* 307 F.3d 24, 29 (2d Cir.2002) (internal quotation marks and citations omitted). We have also recognized that if an arbitration provision is broad, as it is here, a presumption of arbitrability attaches such that "arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d Cir.2001) (internal quotation marks and citations omitted).

■ In its Opinion and Order of June 14, 2004, the District Court first noted that these presumptions applied, but then found that plaintiffs' claims were "not subject to arbitration" because they were not "*connect[ed] with the performance or breach of the contracts.*" *Denney II,* 340 F.Supp.2d at 352 (emphasis in original). This finding—that "[n]othing contained in the contracts relates to BDO advising plaintiffs with respect to tax shelters, foreign investments, and accounting," [14] *id.* at 353—is belied by the plain language of the agreements, which explicitly contemplates that BDO, an accounting firm, was to provide plaintiffs with tax planning services. It is also inconsistent with the District Court's own prior finding in *Denney I,* "that BDO ... contracted with plaintiffs to provide tax shelter advice." 340 F.Supp.2d at 346.

In any case, BDO's services fall well within the scope of the consulting agreements. According to the consulting agreements, BDO was to provide plaintiffs with "certain tax, financing and business consulting services" and assist them "in determining tax treatments" for certain transactions. Because the contractual terms clearly and unambiguously referred to "tax services" that BDO in fact provided, we need not look beyond them. *See McGrail v. Equitable Life Assurance Soc'y of the United States,* 292 N.Y. 419, 424, 55 N.E.2d 483 (1944) ("When the [contractual] terms used are clear and unambiguous, they are generally to be taken and understood in their plain, ordinary and proper sense.").

Reading the agreements as covering BDO's services is also consistent with the undisputed circumstances surrounding the formation of the agreements. The only advice BDO gave to plaintiffs (including the non-signatory plaintiffs) concerned the tax shelters, *Denney I,* 340 F.Supp.2d at 347, plaintiffs paid BDO the fees contracted for in the agreements, *id.,* and the agreements were executed days before plaintiffs acted upon BDO's COBRA tax advice.

The District Court's conclusion that the services BDO provided were not within the scope of the agreement was therefore clearly erroneous, and the BDO defendants' motion to compel arbitration should have been granted with respect to the signatory plaintiffs. *See Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .").

---

14. The District Court did not explain its conclusion that "[n]othing contained in the contracts relates to BDO advising plaintiffs with respect to the tax shelters, foreign investments, and accounting." *Denney II,* 340 F.Supp.2d at 353. Instead, the Court appears to have assumed, without the benefit of any supporting evidence or citation to the record, that "the work BDO did for plaintiffs in connection with COBRA was done pursuant to oral agreements, which of course contain no arbitration clauses." *Id.* at 353 n. 4.

## III. The Non–Signatories

The District Court found the arbitration provisions unenforceable because the consulting agreements were a product of mutual fraud and, alternatively, found the provisions inapplicable because the services performed by BDO were outside the scope of the consulting agreements. Accordingly, the District Court did not address (1) whether plaintiffs were estopped from avoiding arbitration with the Deutsche Bank defendants, non-signatories to the consulting agreements, or (2) whether the non-signatory plaintiffs should be compelled to arbitrate their claims against defendants alongside the signatory plaintiffs.

### A. Non–Signatory Defendants

■ We have previously indicated that signatories to an arbitration agreement can be compelled to arbitrate their claims with a non-signatory where "a careful review of 'the relationship among the parties, the contracts they signed ..., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Industries v. Stolt–Nielsen SA*, 387 F.3d 163, 177 (2d Cir.2004) (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir.2001)); *see also Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 209 (2d Cir.2005) ("A useful benchmark for relational sufficiency can be found in our estoppel decision in *Choctaw* ... where we held that the signatory to an arbitration agreement is estopped from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." (internal quotation marks and citation marks omitted)).

■ Having alleged in this RICO action that the Deutsche Bank and BDO defendants acted in concert to defraud plaintiffs, *see* Am. Compl. ¶ 372 ("[T]he Defendants knowingly acted in concert to market and implement the fraudulent and illegal CO-BRA tax shelter transaction."); *id.* at ¶¶ 1, 59, 243, 251, 263–264, 279, 289–294, 373–375, and that defendants' fraud arose in connection with BDO's tax-strategy advice, *see id.*, plaintiffs cannot now escape the consequences of those allegations by arguing that the Deutsche Bank and BDO defendants lack the requisite close relationship, or that plaintiffs' claims against the Deutsche Bank defendants are not connected to Deutsche Bank's relationship with BDO. *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir.2000) ("[A]pplication of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.") (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir.1999)).

The question remains, however, whether plaintiffs' claims against the Deutsche Bank defendants are so "intimately founded in" or "intertwined with" the underlying obligations of the consulting agreements as to allow the non-signatory Deutsche Bank defendants to compel arbitration. *See JLM Indus. Inc.*, 387 F.3d at 178 (internal quotation marks and citations omitted). We therefore remand the cause to the District Court to enable it to consider the merits of the estoppel claim asserted by the Deutsche Bank defendants and, specifically, whether the issues the Deutsche Bank defendants seek to arbitrate are indeed intertwined with the consulting agreements. *See id.; see also Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d

276, 280 (2d Cir.2003) (compelling a signatory to a charter party to arbitrate its claims with a non-signatory where signatory argued in its complaint that non-signatory "breached duties owed *under the charter party* itself") (emphasis in original).

### B. Non–Signatory Plaintiffs

With respect to the non-signatory plaintiffs,[15] the District Court should consider on remand whether these parties should be required to arbitrate their claims under *Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776–79 (2d Cir.1995) (enumerating the circumstances under which a non-signatory party may be bound to an arbitration agreement), mindful that it is *not* the case that "'an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision,'" *id.* at 776 (quoting *Fisser v. Int'l Bank,* 282 F.2d 231, 233 (2d Cir. 1960)). If defendants are able to show that any of the five circumstances—to wit, (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter-ego, and (5) estoppel—under which a non-signatory may be compelled to arbitrate a claim with a signatory to an agreement containing an arbitration clause applies, *see Thomson–CSF,* 64 F.3d at 776, the District Court must enter an order directing the parties to arbitrate their claims under the consulting agreements.

### CONCLUSION

For the reasons stated above, we (1) reverse as clearly erroneous the District Court's finding that the consulting agreements were "mutually fraudulent"; (2) reverse as clearly erroneous the District Court's finding that the services BDO provided to plaintiffs fell outside the scope of the consulting agreements; (3) vacate the District Court's order denying defendants' motion to compel plaintiffs to arbitrate their claims; and (4) remand the cause to the District Court for further consideration, consistent with this opinion, of whether the non-signatory defendants can compel arbitration and whether the non-signatory plaintiffs can be compelled to submit to arbitration.

**THE UNITED STATES DEPARTMENT OF EDUCATION and Margaret Spellings, in her official capacity as United States Secretary of Education,\* Defendants–Appellees,**

J. DeStefano, DD Tiffany Circles Investments, L.L.C., Tiffany Circle Partners, Kathryn M. Kirisits, and Fayetteville Partner.

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), United States Secretary of Education Margaret Spellings is automatically substituted for former United States Secretary of Education Dr. Roderick R. Paige as a defendant-appellee in this case.

---

15. The non-signatory plaintiffs include Jeff Blumin, Kyle Blumin, L. Michael Blumin, JB Hilltop Investments L.L.C., KB Hoag Lane Investments, L.L.C., MB St. Andrews Investments, L.L.C., Laurel Hollow Investors, Inc., TD Cody Investments, L.L.C., RTW High Investments, L.L.C., NRK Syracuse Investments, L.L.C., DKW Partners, DKW Lockport Investors, Inc., Donald A. DeStefano, Patricia