433 F.3d 220
 Michael F. ADAMS, individually and in his capacity as President of the Sheriff Officers Association, Inc., John Doe and Jane Doe, being persons in the Bargaining Unit represented by the Sheriff Officers Association, Inc. and whose names are too numerous to mention, Plaintiffs-Appellees,
v.
Thomas SUOZZI, in his capacity as County Executive of the County of Nassau, Howard Weitzman, in his capacity as Comptroller of the County of Nassau and County of Nassau, Defendants-Appellants.
No. 04-6017-CV.
 United States Court of Appeals, Second Circuit.
 Argued: September 15, 2005.
 Decided: December 30, 2005.
 
 COPYRIGHT MATERIAL OMITTED Malcolm A. Goldstein, Koeler & Isaacs, New York, NY, for plaintiffs-appellees.
 Edward A. Brill, Proskauer Rose LLP, New York, NY, (Lorna B. Goodman, Nassau County Attorney, David B. Goldin, Damon S. Levenstien, Office of the Nassau County Attorney, Mineola, NY; Steven P. Gonzalez, Thomas A. McKinney, Proskauer Rose LLP, New York, NY, on the brief), for defendants-appellants.
 Before: MESKILL and CABRANES, Circuit Judges, and MUKASEY, District Judge.*
 MUKASEY, Chief Judge.
 
 
 1
 Thomas Suozzi, Howard Weitzman, and the County of Nassau (collectively "the County") appeal the District Court's denial of their motion to stay litigation pending arbitration in a dispute over the County's implementation of a "lag payroll" as to members of the Nassau County Sheriff Officers Association ("ShOA"). See Adams v. Suozzi, 340 F.Supp.2d 279 (E.D.N.Y.2004). The County argues that the District Court erred in holding that a 1999 Memorandum of Agreement ("Lag Payroll Agreement" or "LPA") did not contain an enforceable arbitration agreement between the County and ShOA because the LPA itself was "inoperative" due to the fact that conditions precedent to the formation of a contract had not been met.[1] In particular, the County argues that the issue of whether the LPA was inoperative itself fell within the scope of the LPA's arbitration clauses, that the arbitration clauses in the LPA were severable from the rest of the agreement, that the District Court misconstrued the terms of the conditions precedent to formation of a contract, and that the District Court should have held a trial to determine whether the conditions had been fulfilled. Because we agree with the District Court that at least one of the conditions precedent — execution of a Memorandum of Agreement regarding a collective bargaining agreement between the County and ShOA ("the CBA condition") — was not met, we affirm its denial of the motion to stay.
 
 I. Background
 A. The Lag Payroll Agreement
 
 2
 On December 22, 1999, the County and five employee unions, including ShOA, signed the LPA, which allowed the County, "during calendar year 2000, [to] institute and maintain a `lag payroll' ...." (Joint Appendix (J.A.) 139) Paragraph 2 of the LPA defined "lag payroll" as payroll changes "to be made on or after April 1, 2000" that would allow the County to defer ten days of pay for each union employee "during the fifty-two calendar weeks of calendar year 2000." (Id. at 139) The County would accomplish this deferral by issuing paychecks for ten days' work every eleven days. (Id.) Employees would receive their deferred salaries only upon separation from County service. (Id.) Paragraph 5 stated that the County would not lay off any personnel in the year 2000 and that if the County made any layoffs before the end of 2002, it would terminate the lag payroll program and pay all employees their deferred salaries. (Id. at 140)
 
 
 3
 The LPA contained several references to arbitration. Paragraph 2 required that any dispute about the methodology of implementation be submitted to Arbitrator Scheinman, who had acted as a mediator in the formation of the agreement. (Id. at 139, 143) Paragraph 4 gave Scheinman jurisdiction to determine a remedy if lagged salary could not be made "pensionable." (Id. at 140) Paragraph 7, the broadest arbitration clause in the LPA, stated that a "breach of the terms of this Memorandum [would] be a grievance under each respective union collective bargaining agreement"; it then provided for expedited arbitration by Scheinman. (Id.)
 
 
 4
 In Paragraph 9, the LPA stated that the "Memorandum [was] subject in all respects to the internal ratification procedures of each of the unions," and that the union representatives agreed to recommend it to their Executive Boards. (Id.) Paragraph 9 provided further:
 
 
 5
 This Memorandum shall be inoperative as to any union which fails to ratify within 45 days, except that in the case of the ShOA, such ratification is contingent upon execution of a further Memorandum of Agreement for the terms and conditions of an initial County/ShOA Collective Bargaining Agreement. (Id.)
 
 
 6
 The LPA singled out ShOA in this clause because, at the time, ShOA was involved in litigation over its recent certification as an independent bargaining unit for corrections officers and thus did not have a collective bargaining agreement ("CBA") with the County. (Id. at 136)
 
 B. Implementation of the LPA
 
 7
 The LPA was not submitted to ShOA's Executive Board for ratification. (Id. at 67-68) The County did not implement a lag payroll with respect to ShOA, and it did not lay off any ShOA employees in 2000, 2001, or 2002. (Id. at 137) However, the County did impose a lag payroll on the other unions that signed the LPA. (Id.)
 
 
 8
 The County approved a Memorandum of Agreement regarding a CBA ("CBA Memorandum") with ShOA on August 10, 2001. (Id. at 94) The CBA Memorandum stated that the CBA would govern for the period January 1, 1998, to December 31, 2004. (Id. at 97) Neither the CBA Memorandum nor the CBA itself mentioned the LPA, but the Memorandum did note that "all ... interim agreements shall remain valid." (Id. at 100)
 
 
 9
 Suozzi took office as County Executive in January 2002. (Id. at 138) In a letter dated August 27, 2003, the County's Office of Labor Relations informed ShOA President Michael Adams that, pursuant to the LPA, it would begin to lag ShOA employee salaries for the payroll period ending September 18, 2003. (Id. at 111)
 
 C. Appellees' Suit
 
 10
 On September 4, 2003, Adams and other ShOA members sued the County in New York State Supreme Court, Nassau County. They sought declaratory, injunctive, and monetary relief, alleging that imposition of the lag payroll violated the U.S. Constitution, the New York Constitution, state statutory law, and the CBA. (Id. at 6, 11-16) The County filed a notice of removal in the United States District Court for the Eastern District of New York on September 5, 2003. (Id. at 1)
 
 
 11
 The County conceded that it had no right to impose the lag payroll upon ShOA members other than under the LPA. (Id. at 160) It therefore moved the District Court to stay proceedings pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3 (2000), on the ground that the LPA required arbitration of the dispute. (J.A. 160-62)
 
 
 12
 The District Court denied the County's motion. It held that the parties never agreed to arbitrate because the contract embodying the arbitration provisions never became effective. See Adams, 340 F.Supp.2d at 282-84. The District Court determined that Paragraph 9 of the LPA established two conditions precedent to the formation of a contract between the County and ShOA — (i) ratification of the LPA by ShOA and (ii) execution of the CBA Memorandum. Id. at 283. The District Court stated that, even if ShOA were found to have ratified the LPA,[2] the second condition prevented formation of a contract because the LPA "states that the County may institute a lag payroll in calendar year 2000, which had lapsed by the time the [CBA Memorandum] was executed in August 2001." Id. This appeal followed.
 
 II. Discussion
 A. Subject Matter Jurisdiction
 1. Original Jurisdiction
 
 13
 Although neither the District Court nor appellees have questioned the County's removal of this case to federal court based on federal question jurisdiction under 28 U.S.C. § 1331 (J.A. 2), we "may examine subject matter jurisdiction, sua sponte, at any stage of the proceeding." F.D.I.C. v. Four Star Holding Co., 178 F.3d 97, 100 n. 2 (2d Cir.1999). It is necessary to clarify the basis of the District Court's original jurisdiction over this case for two reasons. First, as appellants pointed out in a letter to the District Court, the dispositive issue in this case is "whether the [LPA] gives the County of Nassau the right to impose a lag payroll" — an issue not inherently federal. (J.A. at 160-61) Second, the District Court mentioned subject matter jurisdiction only when it wrote that it could "properly exercise federal question jurisdiction over this dispute" because, "[i]n enacting the [FAA], Congress created national substantive law governing all questions of the validity and enforceability of arbitration agreements." Adams, 340 F.Supp.2d at 282. However, the FAA "is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal question jurisdiction under 28 U.S.C. § 1331 ... or otherwise." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).
 
 
 14
 Nevertheless, the District Court had subject matter jurisdiction over this case under 28 U.S.C. § 1331 because one of the federal constitutional claims asserted by ShOA in its original complaint met the lenient standard necessary for federal question jurisdiction set by the "substantiality doctrine." A federal court may refuse to entertain a claim based on federal law otherwise within its jurisdiction only if the federal basis for that claim is "so attenuated and unsubstantial as to be absolutely devoid of merit." Tancredi v. Metro. Life Ins. Co., 378 F.3d 220, 224 (2d Cir.2004) (quoting Hagans v. Lavine, 415 U.S. 528, 536, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) (quoting Newburyport Water Co. v. Newburyport, 193 U.S. 561, 579, 24 S.Ct. 553, 48 L.Ed. 795 (1904))) (internal quotation marks omitted); accord IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1055 (2d. Cir.1993). A claim is not insubstantial merely because it relies upon a tenuous legal theory or is otherwise likely to fail. See Tancredi, 378 F.3d at 224; IUE AFL-CIO Pension Fund, 9 F.3d at 1055. Rather, "[c]laims are deemed insubstantial `only if ... prior decisions inescapably render the claims frivolous.'" Tancredi, 378 F.3d at 224 (quoting Hagans, 415 U.S. at 538, 94 S.Ct. 1372).
 
 
 15
 Here, appellants asserted a federal due process claim otherwise within the scope of 28 U.S.C. § 1331 that we cannot say was "absolutely devoid of merit."[3] The complaint alleged that imposition of the lag payroll would deprive ShOA members of liberty and property interests in various rights secured by state law — in particular, the right to a collective bargaining process and the right to compensation and benefits. (J.A. 12-14) A right created and preserved by state law can serve as the foundation for an entitlement sufficient to invoke the protections of the Due Process Clause. See Sealed v. Sealed, 332 F.3d 51, 55 (2d. Cir.2003). We have found no case addressing and rejecting a claim based on the particular rights, official action, and existing protections asserted in this case that would render appellees' due process claim inescapably frivolous.[4] Thus, without further comment as to the merits of the claim, we believe it meets the standard necessary to have given the District Court subject matter jurisdiction over this case.
 
 2. Appellate Jurisdiction
 
 16
 The FAA provides for interlocutory appeal of an order "refusing a stay of any action" pending arbitration. 9 U.S.C. § 16(a)(1)(A). The FAA applies to contracts "evidencing a transaction involving commerce." Id. § 2; see also Moses H. Cone Mem'l Hosp., 460 U.S. at 24, 103 S.Ct. 927. Although there is scant authority addressing whether the FAA applies to public sector labor agreements, the Supreme Court has held that the term "involving commerce" signifies the "broadest permissible exercise of Congress' Commerce Clause power." Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003). Congress has authority to regulate public employment under the Commerce Clause, just as it can regulate employment in the private sector, so long as such regulation is not "destructive of state sovereignty or violative of any constitutional provision." See Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 537, 554-57, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). This power extends to ostensibly intrastate economic activity that has a cumulative substantial effect on interstate commerce. See United States v. Morrison, 529 U.S. 598, 608-09, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Here, the LPA includes terms that affect the wages, pensions, and job security of public employees. Just as "[n]o elaborate explanation is needed to make evident the broad impact of commercial lending on the national economy or Congress' power to regulate that activity pursuant to the Commerce Clause," Citizens Bank, 539 U.S. at 58, 123 S.Ct. 2037, no extended discussion is required to show that employment agreements like the LPA "evidence[] a transaction involving commerce,"[5] 9 U.S.C. § 2.
 
 B. Existence of an Agreement To Arbitrate
 
 17
 1. Judicial Authority To Determine Existence of an Arbitration Agreement
 
 
 18
 We review de novo the District Court's denial of the motion to stay litigation pending arbitration. Mediterranean Shipping Co. S.A. Geneva v. POL-Atlantic, 229 F.3d 397, 402 (2d Cir.2000).
 
 
 19
 The District Court possessed not only authority, but a duty, to determine whether there ever existed an agreement to arbitrate between the parties. AT & T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."); Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir.1999). The County can point to no provision of the LPA that "clearly and unmistakably" assigns the question of arbitrability to the arbitrator in the first instance. Even the broadest reference to arbitration in the LPA — that a "breach of the terms of this Memorandum shall be a grievance under each respective union collective bargaining agreement" subject to expedited arbitration — does not suggest that its purpose is to change the normal authority of court and arbitrator.
 
 2. Existence of a Contract
 
 20
 If the contract embodying a purported arbitration agreement never existed, the arbitration agreement itself does not exist. See Specht v. Netscape Communications Corp., 306 F.3d 17, 26 (2d Cir.2002); Interocean Shipping Co. v. Nat'l Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir.1972). The County now asks us to carve out an exception to this general rule, arguing that an arbitration clause is severable from the rest of a potential contract when a condition precedent to contract formation fails to occur.
 
 
 21
 The County relies on the distinction this court has drawn between "void" and "voidable" contracts when considering the severability of arbitration clauses. "Void" contracts "produce[] no legal obligation." Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 31 (2d Cir.2001). A contract is "void" when, for example, there was no meeting of the minds about essential terms or where there was fraud in the factum. See Denney v. BDO Seidman, L.L.P., 412 F.3d 58, 67-68 (2d Cir.2005). "Voidable" contracts are subject to rescission, but otherwise create legal obligations. Sphere Drake, 263 F.3d at 31. An agreement entered into through fraud in the inducement is an example of a "voidable" contract. Id. Only if a contract is "void," and not "voidable," can a party challenge the enforceability of an arbitration clause without alleging a particular defect with that clause. See Denney, 412 F.3d at 67 (discussing this court's treatment of Prima Paint Corp. v. Flood & Conklin Manufacturing, 388 U.S. 395, 402, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), in Sphere Drake, 263 F.3d at 31). If a contract is "void," a party wishing to avoid arbitration does not have to challenge the arbitration clause specifically; if a contract is "voidable," the party must show that the arbitration clause itself is unenforceable. Sphere Drake, 263 F.3d at 32. The County's contention is that failure of a condition precedent to formation results in a "voidable" contract, and that ShOA does not point to any defect negating specifically the arbitration provisions in the LPA. Therefore, according to the County's position, the very question of whether a condition precedent to formation has been satisfied, or even exists, belongs to the arbitrator.
 
 
 22
 When contract formation is at issue in an FAA case, we generally apply state-law principles. See Specht, 306 F.3d at 27. Applying these principles, we see no reason why a contract that does not exist due to failure of a condition precedent to formation is any less "void" than any other contract that never comes into existence.[6] New York law provides that when there is a "condition precedent to the formation or existence of the contract itself ... no contract arises `unless and until the condition occurs.'" Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon, & Co., 86 N.Y.2d 685, 690, 636 N.Y.S.2d 734, 737, 660 N.E.2d 415 (1995) (citation omitted) (emphasis added); accord SCS Communications, Inc. v. The Herrick Co., 360 F.3d 329, 341 (2d Cir.2004). It was not error for the District Court to interpret the "shall be inoperative" language in Paragraph 9 of the LPA as establishing conditions precedent to formation of a contract between the County and ShOA, one of which was the execution of the CBA Memorandum. Cf. Oppenheimer & Co., Inc., 86 N.Y.2d at 687, 636 N.Y.S.2d 734, 660 N.E.2d 415 (interpreting a provision that purported to render an agreement "null and void" as a condition precedent to the formation of a contract). Thus, if the CBA condition imposed by the LPA was not met, both the contract and any arbitration agreements therein would never have existed.
 
 3. Interpretation of the CBA Condition
 
 23
 The County challenges the District Court's determination that the LPA placed a time limit on satisfying the CBA condition. The County argues that, at the least, the District Court should have held a trial to establish both the terms of the condition and whether they had been met. We disagree. The District Court held correctly that the LPA was unambiguous in requiring fulfillment of the CBA condition at least in time for the County to implement the lag payroll in the year 2000.
 
 
 24
 The mere absence of a time limit, or even reference to time, in the ninth paragraph of the LPA does not allow infinite time for fulfillment of the CBA condition. Indeed, it does not even create ambiguity as to whether there is a time restriction on fulfillment of the condition. "A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 528, 794 N.E.2d 667 (2003) (internal quotation marks omitted); accord Kinek v. Paramount Communications, Inc., 22 F.3d 503, 509 (2d Cir.1994). The LPA was emphatic to the point of redundancy in its insistence that the County could defer only wages that would otherwise have been paid in the year 2000. The first paragraph of the LPA limited implementation and maintenance of the lag payroll to that year, and the second paragraph defined the lag payroll as deferral of ten days' pay "during the fifty-two calendar weeks of calendar year 2000." (J.A. 139) Thus, fulfillment of the CBA condition in 2001 occurred too late to allow the County to implement the lag payroll. An interpretation of the CBA condition that would result in formation of a contract when the County could no longer reap any advantage — a Lag Payroll Agreement with no lag payroll — would defeat the contract's purpose. Just as the "meaning of a writing may be distorted where undue force is given to single words or phrases," Empire Props. Corp., 288 N.Y. at 248, 43 N.E.2d 25, the meaning of the LPA would be distorted by imagining significance in the absence of a time limit in the ninth paragraph. We must "give each clause its intended purpose in the promotion of the primary and dominant purpose of the contract," id., and thus conclude that the CBA condition had to be satisfied early enough for the parties to obtain the benefits of the potential contract. Because the parties did not execute the CBA Memorandum until 2001, the LPA never entered into force as a contract.
 
 
 25
 In light of the above analysis, we need not remand this case to the District Court for trial to determine whether the LPA placed a time limit on the CBA condition or whether the condition was fulfilled. Although the FAA provides that "[i]f the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof," 9 U.S.C. § 4, no trial is required where the court can rule upon the existence of the arbitration agreement "as a matter of law on the record before it," Specht, 306 F.3d at 28. Whether a contract is ambiguous is a question of law, not fact. Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir.2005) (citing Kass v. Kass, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 356, 696 N.E.2d 174 (1998)). As discussed above, whatever other imprecision there may have been in the ninth paragraph of the LPA,[7] the District Court was correct in determining that lack of an explicit time limit in that paragraph did not create ambiguity, because the plain language of the agreement as a whole imposed a time constraint on the CBA condition: it had to be fulfilled early enough to allow implementation of the lag payroll in 2000 as provided for in the LPA. Neither party has ever disputed that execution of the CBA Memorandum did not occur until 2001. (J.A. 165) Because the District Court's holding that there was no arbitration agreement rested (i) on the correct conclusion of law that the LPA was unambiguous in imposing a time limit on the CBA condition and (ii) on the undisputed fact that no CBA Memorandum had been concluded within this time limit, appellants are not now entitled to a trial.
 
 III. Conclusion
 
 26
 For the foregoing reasons, the judgment of the District Court denying appellants' motion to stay proceedings pending arbitration is affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable Michael B. Mukasey, Chief Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 In its submissions to this court, the County contends for the first time that the collective bargaining agreement concluded between the County and ShOA in 2001 gave rise to an independent obligation to arbitrate regardless of whether the LPA ever constituted a contract. The County concedes that it failed to raise this argument in the District Court. It offers no justification for that failure and makes no suggestion that great injustice would result should we refuse to exercise our discretion to address the issue. We therefore consider this argument to be waived,see Allianz Ins. Co. v. Lerner, 416 F.3d 109, 114 (2d Cir.2005), notwithstanding the general "liberal federal policy favoring arbitration agreements" embodied in the Federal Arbitration Act, Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)) (internal quotation marks omitted).
 
 
 [2]
 Because we affirm based on the District Court's treatment of the CBA condition, we do not address the District Court's discussion of the ratification condition
 
 
 [3]
 Because we establish original jurisdiction based on appellees' due process claim, we do not address whether appellees' claim that imposition of the lag payroll would violate the Contract Clause of the U.S. Constitution was insubstantial
 
 
 [4]
 InCondell v. Bress, 983 F.2d 415 (2d Cir.1992), this court declined to address a claim that a lag payroll constituted a deprivation of property without due process in violation of the Fourteenth Amendment. See id. at 420. Even if that case had rejected the claim, differences in how the lag payrolls in that case and in this were implemented and what mechanisms existed to protect the underlying rights might not have made a subsequent due process claim involving a lag payroll frivolous.
 
 
 [5]
 This court's holding that the FAA does not apply to suits brought under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, where employment contracts are subject to federal labor law,see Coca-Cola Bottling Co. of N.Y. v. Soft Drink & Brewery Workers Union 812, Int'l Bhd. of Teamsters, 242 F.3d 52, 53 (2001), is irrelevant because the employer here is a political subdivision of New York State and thus not subject to the LMRA, see 29 U.S.C. §§ 142, 152(2).
 Nor does the FAA's provision excluding "contracts of employment of ... workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, remove this case from the purview of the FAA. We have interpreted that exclusion narrowly to encompass only "workers involved in the transportation industries." Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 982 (2d Cir.1997).
 
 
 [6]
 One District Court in another Circuit has held explicitly that arbitration clauses are severable from agreements that do not become contracts due to failure of conditions precedent to formationSee Capitol Vial, Inc. v. Weber Scientific, 966 F.Supp. 1108, 1111 (M.D.Ala.1997). Yet even that decision contained language appearing to limit application of the holding to the facts of the case. Recounting other cases where courts had found that nonexistence of the contract as a whole negated arbitration provisions, the District Court stated that "[i]t cannot seriously be contended that this case presents such a basic challenge to the formation of an agreement, where, for two years, the parties voluntarily operated under and abided by a written, signed agreement they jointly prepared." Id. at 1111 n. 2.
 
 
 [7]
 For example, the paragraph does not specify at exactly what point in the year 2000 the CBA condition had to be fulfilled — whether by the earliest date the County could have imposed the lag payroll, or the latest date the County would have had time to defer ten days of pay according to the methodology in the LPA's third paragraph, or some other date