[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-12515
_____

D.C. Docket No. 1:10-cv-20695-FAM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 28, 2012
JOHN LEY
CLERK

SOLYMAR INVESTMENTS, LTD.,
a Cayman Islands Corporation,
ASTROLITE INVESTMENTS, LTD.,
a Cayman Islands Corporation,
ETERNALITE INVESTMENTS, LTD.,
a Cayman Islands Corporation,
SUNRAYS INVESTMENTS, LTD.,
a Cayman Islands Corporation,

Plaintiffs - Appellants,

versus

BANCO SANTANDER S.A.,
BANCO SANTANDER INTERNATIONAL,
SANTANDER BANK AND TRUST, LTD.,
OPTIMAL INVESTMENT SERVICES S.A.,
MANUEL ECHEVERRIA FALLA,
et al.,

Defendants - Appellees.

_____

(February 28, 2012)

Before DUBINA, Chief Judge, MARCUS, and FAY, Circuit Judges.

FAY, Circuit Judge:

At its core, this case presents a novel question about who is supposed to decide what in considering challenges to a contract containing an arbitration clause. While the Supreme Court has recently addressed this general issue in Granite Rock Co. v. International Brotherhood of Teamsters, 130 S. Ct. 2847 (2010), it did not address the particular circumstances at issue here. Namely, whether a district court, having found a valid contract containing an arbitration clause exists, is also required to consider a further challenge to that contract's place within a broader, unexecuted agreement. Having considered those circumstances in light of Granite Rock and other relevant precedent, we find that the district court properly construed the law regarding arbitrability in dismissing Plaintiff-Appellants' suit. Accordingly, we affirm.

**I.**[1]

Plaintiff-Appellants (the "Holding Corporations") are personal investment holding corporations owned by two related Panamanian shareholders. Defendant-Appellees, of which there are two distinct groups, are (1) a related group of banking corporations operating under the umbrella of Banco Santander,[2] which provide banking, investment, and other financial management services; and (2) certain individual officers/employees of Santander. For convenience, we refer to Defendant-Appellees collectively as "Santander."

The Holding Corporations invested an undisclosed sum of money with Santander. At the time of that investment, they informed Santander that they desired low-risk investments. Santander assured them that a low-risk portfolio would be tailored to their needs and that they would receive certain additional services, including comprehensive account management, investment advisory

---

[1] The parties agree that the appropriate standard of review for a district court order compelling arbitration is de novo, see, e.g., Lobo v. Celebrity Cruises, Inc., 488 F.3d 891, 893 n.1 (11th Cir. 2007), as is the standard for review of a ruling on a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937 (2009). Under both Twombly and Ashcroft, we are required to accept well-pleaded facts as true when considering a motion to dismiss. Twombly, 550 U.S. at 572; Ashcroft, 129 S.Ct. at 1949-50.

[2] We see no need to distinguish between the individual Santander entities named in this suit.

services, and other similar services directed towards ensuring their investment needs were met.

Santander invested some of the Holding Corporations' money in a fund called Optimal Strategic US Equity Series of Optimal Multiadvisors Ltd. ("Optimal Strategic"). Optimal Strategic had engaged Bernard L. Madoff "to execute its investment strategy and had all or a substantial part of its assets deposited with and traded through Madoff Securities." Exch. Agmnt. at 2 ¶ IV. While Santander had a policy against investing in funds managed by a single person, it continued to recommend Madoff-run funds to its clients and particularly to the Holding Corporations. Eventually, Madoff's Ponzi scheme was exposed and the Holding Corporations' substantial losses were revealed.[3]

After learning of their losses, the Holding Corporations sought to negotiate a recovery from Santander. Santander's first offer, found within an "Exchange Agreement," involved an exchange of "worthless" Optimal Strategic shares for shares of Santander's own perpetual, non-cumulative 2% shares.[4] The Exchange

---

[3] We need not recount the breadth of the well-documented fraud perpetrated by Bernie Madoff. However, for a discussion of the history of that fraud and the ongoing efforts at recovery, see Irving H. Picard, The Madoff Recovery Initiative (February 13, 2012), http://www.madoff.com.

[4] According to the Exchange Agreement, the relevant terms and conditions were referred to in "Annex 2, identified in Part B of Annex 1." Exch. Agmnt. at 2.

Agreement also contained an arbitration clause.[5] The Holding Corporations rejected Santander's Exchange Agreement as the sole basis for a settlement between the parties. The negotiations continued.

Eventually, the parties agreed to a multi-part, comprehensive settlement. In relevant part, the settlement was to include the Exchange Agreement previously rejected by the Holding Corporations, as well as a non-recourse promissory note secured by Santander's perpetual, non-cumulative 2% preferred shares. The term of the promissory note was ten years.

Several days later, the Holding Corporations received for the first time the Exchange Agreement in English.[6] Santander informed them that they had less than 24 hours to return the signed Exchange Agreement, otherwise they would not be permitted to subscribe to the preferred shares. Counsel for the parties discussed the Exchange Agreement in the context of the comprehensive settlement. The Holding Corporations allege that Santander "represented that the Exchange Agreement was

---

[5] Section 6.1 of the Arbitration provision provides that "all controversies between the client and the bank or the bank parties arising out of or relating to this agreement or matters related thereto, shall be finally and exclusively settled by arbitration . . . ."

[6] On appeal, the Holding Corporations emphasize that the Exchange Agreement had been conveyed to them prior to this time only in Spanish. We see no reason for such emphasis, given the Holding Corporations were created on behalf of two Panamanian citizens and the communications between the parties that are found in the record reflect all parties' fluency in Spanish.

limited to Madoff claims," and was "only one part of the intended Proposed Settlement Agreement." Although the Holding Corporations were unwilling to execute the document because they did not want it to stand alone, Santander told them that they had not yet had time to prepare the necessary paperwork for the other aspects of the agreement and that execution of the Exchange Agreement would be a showing of "good faith." Santander further assured the Holding Corporations that the other relevant documents would be completed soon after.

In reliance on those representations, the Holding Corporations signed the Exchange Agreement.[7] Relevant sections within the Exchange Agreement included the Holding Corporations' acknowledgment that they were "sophisticated investor[s]," and that, "[p]rior to the execution of this Agreement . . . [they had] sought and received, to [their] entire satisfaction, independent financial, legal and taxation advice in relation to this Agreement, this investment in the Preferred Securities and the risks deriving therefrom." Furthermore, the Holding Corporations agreed that, "[i]n making [their] decision to enter into this Agreement, . . . [they were] not relying on any information, representation or warranty given by the Bank, . . . other than as specifically set forth in this

---

[7] In fact, four identical Exchange Agreements were signed by the parties. For the sake of clarity, however, we refer to the Exchange Agreements in the singular.

Agreement . . . ." Moreover, the Exchange Agreement contained an integration clause, which stated that "this Agreement contains the entire agreement between [the Holding Corporations], on the one hand, and [Santander], on the other hand, regarding the subject matter hereof. . . . No oral understandings, statements promises or inducements contrary to the terms of this Agreement exist."

The final provision within the Exchange Agreement relevant to these proceedings was the release provision, wherein the Holding Corporations

> release[d], acquit[ed], and forever discharge[d] [Santander] of and from all past, present, and future claims . . . and any liability ( . . . whether arising out of statute, regulations, contracts, breach of fiduciary duty or tort or otherwise, and whether based on strict liability, fraud, gross negligence or negligence or otherwise) . . . arising out of or in connection with or relating to the Optimal Strategic US Equity Series of Optimal Multiadvisors Ltd., the Optimal Strategic US Equity Ireland Fund, [the Holding Corporations'] Optimal SUS Securities, [the Holding Corporations'] investment in the Optimal Funds or any other matter deriving from an investment managed by any Bank Party, or in connection with which a Bank Party may have rendered advice or investment services, and having any actual or potential exposure to Madoff Securities . . . .

Exch. Agmnt. at 3(F). Santander contemporaneously executed Final Term Sheets as to each holding corporation. The Final Term Sheets specified the terms of the 10-year term notes and the date (April 25, 2009) by which the notes would be funded.

7

Although the parties subsequently exchanged several revisions of the proposed promissory note and a document detailing the pledge of the preferred shares, they failed to come to any agreement as to the structure or substance of those documents. The Holding Corporations' counsel therefore sent an e-mail to Santander's counsel, advising him that they believed no contract had been formed between the parties. The Holding Corporations subsequently filed suit.

The Holding Corporations' 149-page Amended Complaint is the controlling pleading here. Therein, they set forth fourteen counts against Santander, alleging such causes of action as breach of fiduciary duty (Counts I, II, V, VI,), negligence (Counts III, IV, VII, VIII), fraud (Count X), a claim under the Securities and Exchange Act (Counts XII and XIII), a state statutory claim (Count XI), and equitable relief in the form of an unjust enrichment claim (Count IX), as well as seeking declaratory relief (Count XIV). To rebut the explicit language of the Exchange Agreement, the Holding Corporations seek to rely on affidavits and parol testimony regarding the intent of the parties in executing the Exchange Agreement.

Santander asked the district court to dismiss the proceedings, either under the arbitration clause of the Exchange Agreement or the forum-selection provision, which required "that all claims . . . to enforce the Parties' agreement to

8

arbitrate . . . be heard and determined exclusively in the courts sitting in Geneva, Switzerland." Exch. Agmnt. at ¶ 6.2. The district judge referred the matter to a magistrate. The magistrate judge recommended granting dismissal of the Amended Complaint in its entirety, finding that the Exchange Agreements was a binding contract and that, under Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967) and Granite Rock, the Holding Corporations' challenges were reserved for an arbitrator or a court of law.[8] The district court adopted the Report and Recommendation. This appeal follows.

## II.

We turn first, as we must, to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq. It provides that a written arbitration agreement in certain contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Because of the FAA, federal courts are required to place arbitration clauses on equal footing with other contracts. Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2776 (2010); Janiga v. Questar Capital Corp., 615 F.3d 735, 740 (7th Cir. 2010)

---

[8] We need not address the district court findings regarding the forum-selection clause contained within the Exchange Agreement, given our finding that dismissal of the Holding Corporations' Amended Complaint was appropriate in keeping with the Exchange Agreement's arbitration clause.

("[F]ederal law places arbitration clauses on equal footing with other contracts, not above them."). Nonetheless, federal courts interpret arbitration clauses broadly where possible. AT&T Techs., Inc. v. Commn'cs Workers of Am., 475 U.S. 643, 649-50 (1986). The result of such broad interpretation is that "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945 (1995) (internal citation and quotation marks omitted); AT&T Techs., Inc., 475 U.S. at 650 ("Doubts should be resolved in favor of coverage.") (quotation omitted). "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445 (2006).

The challenges before us, however, are not to the arbitration clause contained within the Exchange Agreement, but instead to the binding nature of the Exchange Agreement itself. Namely, the Holding Corporations urge that it was the district court's role, rather than an arbitrator's, to decide whether the Exchange Agreement was but one part of a comprehensive agreement between the parties. Thus, we must first discuss who shall decide what in the context of formation challenges to contracts containing arbitration clauses.

10

The proper allocation of responsibility for deciding such questions was first addressed in the seminal arbitration case, Prima Paint. There, the Supreme Court announced that courts are the proper forum to evaluate a challenge to the validity of an arbitration clause, but where the entire agreement of which an arbitration clause is but a part is challenged, such evaluation is properly left to the arbitrator. Prima Paint, 388 U.S. at 403-04. For over forty years, the Supreme Court has relied on that distinction. See, e.g., Buckeye Check Cashing, 546 U.S. at 446 (holding that, because respondents challenged a contract broadly without challenging the arbitration clause specifically, challenge must be considered by an arbitrator); Rent-A-Center, 130 S. Ct. at 2779-80 (affirming distinction between general challenge to contract rather than to specific arbitration clause).

Nonetheless, in the years following Prima Paint the Supreme Court declined to clarify whether a court or an arbitrator is required to decide any and all disputes over the formation of an agreement containing an arbitration clause. So, for example, the Buckeye Court stated in a footnote that

> The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former, and does not speak to the issue decided in the cases cited by respondents (and by the Florida Supreme Court), which hold that it is for courts to decide whether the alleged obligor ever signed the contract, whether the

11

> signor lacked authority to commit the alleged principal, and whether
> the signor lacked the mental capacity to assent.

Buckeye Check Cashing, 546 U.S. at 444 n.1 (internal citations omitted). See also

Rent-A-Center, 130 S.Ct. at 2778 n.2 (same). As such, the Court recognized a

distinction between challenges to the validity of an agreement containing an

arbitration clause, which were reserved for an arbitrator; and challenges to the

formation of an agreement containing an arbitration clause, which the Court

declined to address.

However, that issue was recently clarified in Granite Rock, when the Court

held that issues concerning contract formation are generally reserved for the courts

to decide. Granite Rock, 130 S. Ct. at 2855-56. Indeed, it found that such a

determination is the threshold question in any dispute involving arbitration. Id. at

2854. Therefore, the district court must first "resolve any issue that calls into

question the formation or applicability of the specific arbitration clause that a

party seeks to have the court enforce." Id. at 2856. In other words, arbitration of a

dispute should only be ordered where "the court is satisfied that neither the

formation of the parties' arbitration agreement nor . . . its enforceability or

applicability to the dispute is in issue. Where a party contests either or both

matters, the court must resolve the disagreement." Id. at 2857-58 (quotation marks omitted) (alteration in original).

It is against this backdrop that the Holding Corporations seek reversal of the district court order. Relying primarily on Granite Rock and its conclusion that certain "gateway matters" such as the existence of agreement must be determined before any arbitration may be ordered, the Holding Corporations argue both that 1) Granite Rock has overturned the bright-line rule announced in Prima Paint; and 2) their challenges constitute formation challenges within the meaning of Granite Rock. We disagree with both assertions.

First, Granite Rock did not overturn Prima Paint.[9] Instead, it simply makes explicit a determination that courts have consistently undertaken. While the Supreme Court had never before mandated that contract formation questions be reserved for courts of law, both the Supreme Court and other courts have long recognized such a de facto result. See, e.g., First Options, 514 U.S. at 944 ("When

---

[9] We note at least three reasons why Granite Rock has not overruled Prima Paint: (1) the Supreme Court has never explicitly overruled its holding in Prima Paint, and we will not assume a case has been overturned in the absence of such explicit language, see Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); (2) Prima Paint continues to play a prominent part in the Supreme Court's jurisprudence on the issue of arbitrability, cited approvingly in Granite Rock, 130 S.Ct. at 2858, and three days earlier in Rent-A-Center, 130 S.Ct. at 2778; and (3) we have no difficulty reconciling the two cases.

13

deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary . . . principles that govern the formation of contracts."); Adams v. Suozzi, 433 F.3d 220 (2d Cir. 2005) (considering issues of contract formation prior to enforcement of arbitration clause).

As such, Granite Rock's threshold inquiry of whether a contract was formed necessarily precedes Prima Paint's bright-line rule but does not erase it. Once a district court has, in accordance with Granite Rock, satisfied itself that "neither the formation of the parties' arbitration agreement nor . . . its enforceability or applicability to the dispute is in issue," Granite Rock, 130 S.Ct. at 2857-58, it will then proceed to consider the nature of the challenge under Prima Paint. There is thus a two-step process required in considering the arbitrability of any contract containing an arbitration clause: 1) resolution of any formation challenge to the contract containing the arbitration clause, in keeping with Granite Rock; and 2) determination of whether any subsequent challenges are to the entire agreement, or to the arbitration clause specifically, in keeping with Prima Paint.

We now apply that two-step process to the facts at issue here.

### III.

First, we address whether the district court properly resolved the formation challenges to the Exchange Agreement as a binding contract. The Holding

14

Corporations challenge the binding nature of the Exchange Agreement on three grounds: (a) any agreement was procured by Santander's fraud in the factum; (b) there was no meeting of the minds; and (c) the conditions precedent were never fulfilled. Underlying all three of those challenges is the Holding Corporations' contention that, since the Exchange Agreement was but a part of the parties' intended settlement, the district court was required to resolve the Holding Corporations' challenges in relation to the comprehensive agreement.

The determination of whether a contract exists between the parties is governed, as the district court recognized, by state law. See First Options, 514 U.S. at 944. Here, the parties agree that Florida law applies and that the goal of Florida law vis-à-vis contract formation is to effectuate the parties' intent. Accord Commerce Nat'l Bank v. Safeco Ins. Co. of Am., 252 So. 2d 248, 252 (Fla. 4th DCA 1971) ("A contract should be construed to give effect to the intent of the parties.").

It is that issue of intent, though, that is the sticking point here, as the parties disagree over their respective intent in signing the Exchange Agreement. The Holding Corporations claim that the Exchange Agreement was only the first step in a broader comprehensive agreement and that, in fact, the Exchange Agreement

is full of ambiguities that prevent it from being binding. Santander takes the contrary position, citing the plain language of the Exchange Agreement.

In Florida, "[i]t is a fundamental tenet of contract law that a phrase in a contract is 'ambiguous' only when it is of uncertain meaning, and may be fairly understood in more ways than one." Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So. 2d 1000, 1002 (Fla. 2d DCA 1995) (quotation marks and internal citation omitted). "In the event of such an ambiguity, a trial court is authorized to admit parol evidence to explain the words used and how the contracting parties intended them to be interpreted." Id. (citation omitted). However, in the absence of such ambiguity, parol evidence is inappropriate. See Fla. Bar v. Frederick, 756 So. 2d 79 (Fla. 2000) (stating parol evidence is only admissible where a party seeking to introduce such evidence can establish that the document is ambiguous); Lab. Corp. of Am. v. McKown, 829 So. 2d 311, 313 (Fla. 5th DCA 2002). Thus, where a contract is facially complete and contains no ambiguous terms, Florida law requires those contracts be enforced in accordance with their terms. Accord id.; Arnold v. First Sav. & Trust Co., 104 Fla. 545, 559 (1932) ("It is elementary law that a contract will be construed according to its own clear and unambiguous terms, and that the construction placed upon it by the parties thereto is relevant only in determining the proper construction of a contract when the provisions

16

thereof are ambiguous. If the contract is clear and unambiguous, the legal construction of it follows, regardless of what construction may apparently have been placed upon it by the parties.").

Both before the district court and on appeal, the Holding Corporations posited certain facts that they claim vitiated their consent to the Exchange Agreement. For example, they claim that Santander informed them that the Exchange Agreement was but one part of the comprehensive agreement between the parties; that they had insufficient time to review the Exchange Agreement, given the time constraints placed on them once they received the Exchange Agreement in English; that the parties' negotiations after the signing of the Exchange Agreement show that certain terms were still open; and that Santander had informed them that the Exchange Agreement was limited only to their Madoff claims. As proof of these facts, the Holding Corporations offer parol evidence such as affidavits and communications between the parties.

However, the district court properly declined to consider the parol evidence offered by the Holding Corporations because the Exchange Agreement is not ambiguous. A plain reading of the Exchange Agreement simply does not support the Holding Corporations' contention that "the parties le[ft] open essential terms

17

. . . for further negotiation and execution of subsequent documents." Most obviously, the Exchange Agreement's integration clause, supra, states that the Exchange Agreement "contains the entire agreement between" the parties. However, the Exchange Agreement makes no reference to the comprehensive agreement now alleged by the Holding Corporations. Rather, it clearly describes the pertinent history leading up to the parties' agreement; details the parties' respective obligations under §§ 1-3; and outlines other miscellaneous duties relating to the enforcement of the agreement. There are no blank spaces reserved for later resolution, and key terms are defined. On its face, therefore, the Exchange Agreement is a complete and final document. See Sassano, 664 So. 2d at 1003 ("[I]n the absence of an ambiguity on the face of a contract, it is well settled that the actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls." (internal citations and quotation marks omitted)).

Nor can the Holding Corporations rely upon the fraudulent "inducement exception" to admit evidence contrary to the parol evidence rule. While the inducement exception permits the admissibility of certain evidence contrary to the parol evidence rule, it is inapplicable where the proffered oral testimony sought to be admitted would "directly contradict[] an express provision" of the Exchange

18

Agreement. <u>Accord</u> <u>Ungerleider v. Gordon</u>, 214 F.3d 1279, 1282 (11th Cir. 2000) (interpreting Florida law). Moreover, the inducement exception only applies where a "written instrument does not purport to contain the entire agreement between the parties." <u>Id.</u> at 1282 (citing <u>Bond v. Hewitt</u>, 111 Fla. 180, 185 (1933)). No such circumstances exist here, where the Exchange Agreement, both through its integration clause and through its lack of reference to other contracts, facially contained the entire agreement between the Holding Corporations and Santander. Accordingly, notwithstanding the Holding Corporations' contentions to the contrary, the district court properly refused to consider parol testimony on considering the nature of the Exchange Agreement.

Before we turn to the specific challenges raised by the Holding Corporations to the Exchange Agreement, however, we must first consider their challenge to the Exchange Agreement as a part of a broader agreement. The Holding Corporations now argue that their challenges go not just to the formation of the Exchange Agreement, but also to the formation of a broader agreement of which the Exchange Agreement is but a part.

In the context of the FAA, though, challenges to the role of a written agreement are not questions of formation but rather of validity. As noted above, the Supreme Court has long recognized a distinction between the two. <u>Buckeye</u>

Check Cashing, 546 U.S. at 444 n.1 ("The issue of the contract's validity is different from the issue whether any agreement . . . was ever concluded."). Nor did Granite Rock amend that distinction. Granite Rock, 130 S.Ct. at 2860 n.9, n.11. Instead, Granite Rock states explicitly that once a court is satisfied with the "formation of the parties' arbitration agreement" and "the applicability of the specific arbitration clause that a party seeks to have the court enforce," id. at 2854, reference to an arbitrator to resolve any outstanding issues is appropriate. With the district court having satisfied itself that the Exchange Agreement was a binding contract, asking the district court to assess the validity of the Exchange Agreement relative to a broader, unexecuted agreement would be an invasion of the responsibility that the Supreme Court has reserved for the arbitrator. See, e.g., Buckeye Check Cashing, 546 U.S. at 448-49 (holding validity challenges to a whole contract go to the arbitrator); Benoay v. Prudential-Bache Sec., Inc., 805 F.2d 1437, 1441 (11th Cir. 1986) (reserving for arbitrator consideration of certain claims regarding validity of underlying contract as opposed to validity of arbitration clause).

Moreover, we note that, in arguing that the district court must consider all formation challenges subsequent to Granite Rock, the Holding Corporations cite

cases that are wholly inapposite.[10] For example, citing Gore v. Alltel Communications, LLC, No. 10-735-DRH, 2011 WL 1303820 (S.D. Ill. Apr. 1, 2011), rev'd, --- F.3d ---, 2012 WL 169758 (7th Cir. (Ill.) Jan. 19, 2012), the Holding Corporations argue that all contract formation disputes must be resolved by the district court in the first instance. However, the district court in that case was faced with an arbitration agreement that the parties disputed having signed. Gore, 2011 WL at 1303820 at *4. Similarly, the Holding Corporations cite Dedon GmbH v. Janus et Cie, 411 Fed. Appx. 361 (2d Cir. 2011). However, there too the existence of a contract containing an arbitration clause was in dispute, as one of the parties to the contract had not signed it.[11] Likewise, another case cited by the Holding Corporations, Van Tassell v. United Marketing Group, LLC, 795 F. Supp. 2d 770, 788 (N.D. Ill. 2011), involved a party disputing whether it had ever read or signed the contract in question.

Here, there is no such dispute over whether the parties read or signed the Exchange Agreement, or whether the Exchange Agreement contained an

___

[10] Of course, it is axiomatic that this Circuit is bound only by its own precedents and those of the Supreme Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) ("[T]he decisions of one circuit are not binding on other circuits."). This is even more obvious in the context of a district court determination from another circuit.

[11] The signatory dispute is not readily apparent on review of the Second Circuit case, although it is referred to with particularity by the district court in Dedon GmbH v. Janus et Cie, No. 10 Civ. 04541, 2010 WL 4227309, *1 (S.D.N.Y. Oct. 19, 2010).

21

arbitration clause to which the parties consented. Cf. Chastain v. Robinson-Humphrey Co., Inc., 957 F.2d 851, 854 (11th Cir. 1992) ("Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. The calculus changes when it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration."); accord Rainbow Invs., Inc. v. Super 8 Motels, Inc., 973 F. Supp. 1387, 1391 (M.D. Ala. 1997) (decided prior to Granite Rock but noting that courts should consider formation challenges only where there is a "viable claim of lack of assent" in the form of signatures to the underlying contract).

Thus, requiring the district court to resolve any challenge to the Exchange Agreement's place in the alleged comprehensive agreement would constitute broader inquiry than contemplated by the Granite Rock or Prima Paint Courts; and, just as importantly, it would be contrary to the explicit terms of the Exchange Agreement. We decline the Holding Corporations' request to expand the scope of inquiry into arbitrability. Therefore, we now turn to the Holding Corporations' specific formation challenges to the Exchange Agreement as a binding contract.

**A.**

22

The Holding Corporations first challenge the Exchange Agreement as void because it was obtained by fraud in the factum. However, much as Shakespeare long ago observed that a rose by any other name is still but a rose,[12] we find that a fraud in the inducement claim, though garbed in the trappings of fraud in the factum, is still but a fraud in the inducement claim.[13] Because Prima Paint requires reference to an arbitrator for a general challenge to a contract on the grounds of fraud in the inducement, Prima Paint, 388 U.S. at 403-04, we are not surprised that the Holding Corporations seek instead to plead a claim for fraud in the factum. However, a rose is but a rose.

As an initial matter, we note the distinction in case law between fraud in the factum and fraud in the inducement. As noted by one of our district courts,

> [f]raud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the

---

[12] William Shakespeare, "Romeo and Juliet," act. 2, sc. 2.

[13] A successful fraud in the factum claim makes the underlying contract void ab initio, Baumann v. Savers Fed. Sav. & Loan Ass'n, 934 F.2d 1506, 1516 (11th Cir. 1991)("Fraud in the factum renders an instrument entirely void . . . ."), whereas a successful claim for fraud in the inducement only makes the underlying contract voidable. See Fed. Sav. & Loan Ins. Corp. v. Gordy, 928 F.2d 1558, 1565 (11th Cir. 1991) ("Fraud in the inducement . . . render[s] the instrument merely voidable and thus capable of transfer."). Of the two, only voidable contracts are subject to rescission but still create legal obligations. Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 31 (2d Cir. 2001). This distinction is therefore crucial to determining whether a contract exists for purposes of arbitration. But cf. Buckeye Check Cashing, 546 U.S. at 440 (begging the question whether that distinction still exists). While four Supreme Court justices disregard this distinction, see Rent-A-Center, 130 S.Ct. at 2786 (Stevens, J., dissenting) ("Whether the general contract defense renders the entire agreement void or voidable is irrelevant."), we need not reach that issue, given the facts of this case.

other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action. On the other hand, [f]raud in the factum occurs when a party procures a[nother] party's signature to an instrument without knowledge of its true nature or contents.

Reynolds v. Credit Solutions, Inc., 541 F. Supp. 2d 1248, 1260 (N.D. Ala. 2008), vacated on other grounds by Picard v. Credit Solutions, Inc., 564 F.3d 1249 (11th Cir. 2009) (quotation marks, internal references, and citations omitted); see also Fed. Sav. & Loan Ins. Corp. v. Gordy, 928 F.2d 1558, 1565 (11th Cir. 1991) (same). This distinction is echoed by the Florida Supreme Court. See, e.g., Browning v. Fla. Hometown Democracy, Inc., PAC, 29 So. 3d 1053, 1061 n.4 (Fla. 2010) (citing Black's Law Dictionary for similar distinction).

The primary difference between the two species of fraud claims lies in the parties' understanding of the contract into which they are entering. See, e.g., Cancanon v. Smith Barney, Harris, Upham & Co., 805 F.2d 998 (11th Cir. 1986) (denying arbitration clause on basis of fraud in the factum). If a party understands the nature of the contract they are executing but contends that there has been some material misrepresentation as to the obligations rising thereunder, only a fraud in the inducement claim will lie. Accord Browning, 29 So. 3d at 1061 n.4 (noting fraud in the inducement arises from misrepresentation that leads one to enter a contract "with a false impression of the risks, duties, or obligations involved,"

24

while fraud in the factum arises "when a legal instrument executed differs from the one intended for execution").

Cancanon, notwithstanding the Holding Corporations' argument to the contrary, is representative of this distinction. There, the plaintiffs (who could not read English) alleged that they were told by their English-speaking financial advisor that they were signing an agreement to open a money market account. Cancanon, 805 F.2d at 999. In reality, however, they had been given a security account agreement that permitted representatives of Smith Barney to trade securities on their behalf. The plaintiffs signed the agreement. After suffering substantial losses arising from Smith Barney's securities trades and associated fees, the plaintiffs sued, alleging fraud in the factum. Smith Barney moved to compel arbitration under the terms of the signed agreement. Both the district court and our court found that arbitration was inappropriate because of the alleged "misrepresentation of the character or essential terms of the contract." Id. at 1000. See also In re Arbitration Between Nuclear Elec. Ins. Ltd., 926 F. Supp. 428, 434 (S.D.N.Y. 1996) (noting other types of fraud in the factum include forgery of signature, physical coercion, and the like).

Applying this understanding to the Holding Corporations' allegations in the Amended Complaint, we conclude that they cannot state a claim for fraud in the

25

factum. Simply put, their allegations do not relate to the execution of the contract, but instead to their obligations thereunder. For example, they do not allege that they could not read the Exchange Agreement, as did the Cancanon plaintiffs. Cancanon, 805 F.2d at 999. Instead, the record is clear that the Holding Corporations here received both an English and Spanish version of the Exchange Agreement before signing it, and that they understood exactly what it was they were signing. Nor have the Holding Corporations alleged that they believed the Exchange Agreement to be something different from what it was, as did the Cancanon plaintiffs. Id. Here, the Holding Corporations knew what they signed and admit that the Exchange Agreement was understood to bind the parties. Their signatures serve as testament to that understanding. Their contention that there were other, subsequent contracts contemplated does not negate the district court's proper finding that the Exchange Agreement itself constituted a binding contract. Therefore, this case presents the situation where a party understands the nature of the contract but contends there has been some underlying material misrepresentation. A fraud in the factum claim will not lie under such circumstances.

Instead, since the Holding Corporations' allegations are more properly characterized as relating to fraud in the inducement, the issue becomes one

properly reserved for an arbitrator. See Prima Paint, 388 U.S. at 403-04. The district court having found the same, we affirm that finding.

**B.**

The Holding Corporations also challenge the Exchange Agreement for an alleged lack of a meeting of the minds. Namely, they contend that "when parties leave open essential terms of a contract for further negotiation and execution of subsequent documents, a binding contract does not exist." In support, they cite cases such as David v. Richman, 568 So. 2d 922, 924 (Fla. 1990), Montgomery v. English, 902 So. 2d 836, 838 (Fla. 5th DCA 2005), and Collectors Editions, Inc. v. Peak, 848 So. 2d 473, 475 (Fla. 5th DCA 2003). We need not address this contention at length, given our finding, supra, that there were no terms left open by the Exchange Agreement.[14] Where a contract is complete on its face, Florida law does not allow further inquiry into whether the contract is a part of a broader contract that is not referenced. See, e.g., Rocky Creek Ret. Props., Inc. v. Estate of Fox ex rel. Bank of Am., N.A., 19 So. 3d 1105, 1108-09 (Fla. 2d DCA 2009)

---

[14] Nor do we find the cases cited by the Holding Corporations persuasive in this regard, since each is predicated on easily distinguished facts from those at issue here. See David, 568 So. 2d at 923 (involving a real estate contract in which there were numerous spaces left blank at the time of execution); Montgomery, 902 So. 2d at 837-38 (predicated on one party's failure to agree to certain hand-written changes to a written real estate contract); Peak, 848 So. 2d at 474-75 (dealing with ongoing settlement discussions between parties where neither party had signed a written settlement agreement). Here, unlike in those cases, the parties made no changes to the unambiguous and express language of the Exchange Agreement and executed it in its entirety.

27

(refusing to consider challenge to contract containing arbitration clause where contract was facially complete and parties are "conclusively presumed to know and understand the contents, terms, and conditions of the contract" they execute).

## C.

Lastly, the Holding Corporations' contend that the Exchange Agreement is not a binding agreement because certain conditions precedent were unfulfilled. We reject that argument on two discrete bases: 1) Florida law does not regard conditions precedent as issues of contract formation; and 2) alleged conditions precedent that are not expressly adopted by the underlying contract are not appropriate for district court consideration.

First, although Florida law permits an exception to the parol evidence rule in the context of a condition precedent, such an exception does not overturn the propriety of the district court's order compelling arbitration. Florida law permits oral testimony to show that a written contract, while unconditional on its face, was delivered subject to a condition precedent. See Ketchian v. Concannon, 435 So. 2d 394, 395 (Fla. 5th DCA 1983). However, under Florida law, whether a condition precedent is at issue is not relevant to contract formation.

Instead, even in the words of the case relied upon by the Holding Corporations, Ketchian, a condition precedent arises as a "defense of non-

28

performance." Id. at 396; see also Custer Med. Ctr. v. United Auto. Ins. Co., 62 So. 3d 1086, 1096 (Fla. 2010) ("[A] defending party's assertion that a plaintiff has failed to satisfy conditions precedent necessary to trigger contractual duties under an existing agreement is generally viewed as an affirmative defense, for which the defensive pleader has the burden of pleading and persuasion.") (emphasis in original); cf. Christian Mut. Life Ins. Co. v. Penn Mut. Life Ins. Co., 163 F. Supp. 2d 260, 262-63 (S.D.N.Y. 2001) (holding under New York law that conditions precedent are not a defense to contract formation). As such, the issue is not one of contract formation for purposes of Granite Rock under Florida law. See Victor v. Dean Witter Reynolds, Inc., 606 So. 2d 681, 683 n.5 (Fla. 5th DCA 1992) (holding under both Florida law and FAA that factual affirmative defenses are properly decided by the arbitrator rather than the court).[15]

Moreover, distinct from the nature of a condition precedent as an affirmative defense, we also find unpersuasive the cases cited by the Holding

---

[15] We therefore need not address the Holding Corporations' reliance on unsatisfied conditions precedent. Nonetheless, we have some doubt that conditions precedent that are not expressly referenced by a written agreement may vary the explicit terms of a written agreement under Florida law. Compare Gunderson v. Sch. Dist. of Hillsborough Cnty., 937 So. 2d 777, 779 (Fla. 1st DCA 2006) ("Provisions of a contract will only be considered conditions precedent or subsequent where the express wording of the disputed provision conditions formation of a contract and or performance of the contract on the completion of the conditions." (emphasis omitted)), with S. Internet Sys., Inc. ex rel. Menotte v. Pritula, 856 So. 2d 1125, 1128 (Fla. 4th DCA 2003) (finding contract was unenforceable because of failure of condition precedent expressly referenced by contract). However, because that issue is ultimately for the arbitrator, we decline to address it here.

29

Corporations. The Holding Corporations rely primarily upon <u>Adams</u> in arguing that conditions precedent constitute a contract formation question that must be considered by the district court rather than an arbitrator.[16] However, in <u>Adams</u> the conditions precedent were expressly stated in two sections of the agreement entered into by the parties. <u>Adams</u>, 433 F.3d at 223. As such, the inquiry into whether a contract was formed necessarily hinged upon whether those conditions had been satisfied. Such an issue is inherently akin to the issue in <u>Granite Rock</u>, where the inquiry hinged upon whether the arbitration clause-containing contract had been ratified. <u>Granite Rock</u>, 130 S.Ct. at 2860 n.9.

However, a condition precedent that is expressly referenced by a contract is a far cry from a condition precedent about which a signed agreement is silent. Instead, such an inquiry would require the district court to delve into issues beyond the validity or execution of a contract, consider the communications between the parties leading up to and after the signing of any agreement, and ignore the express language of any integration clause, as was present here in the Exchange Agreement. <u>Accord</u> <u>Victor</u>, 606 So. 2d at 683 n.5. In other words, such an inquiry would require a district court to invade the province of the arbitrator.[17]

---

[16] We also note that <u>Adams</u> relied on New York law for its interpretation of conditions precedent in the arbitrability context. <u>Id.</u> at 227.

[17] Certainly, where, as here, such an inquiry would necessitate extensive discovery and expend limited judicial resources, as well as run contrary to a signed agreement in which the

Considering the totality of the Holding Corporations' formation challenges to the Exchange Agreement as a binding contract, it is clear that the district court properly considered any challenges it was required to consider under Granite Rock.

## IV.

Therefore, having considered the first step of the Granite Rock inquiry, the district court was then required to consider the second inquiry under Prima Paint. Prima Paint hinges upon whether the challenge raised is to the arbitration clause specifically, or to the contract in which the arbitration clause is found generally. Prima Paint, 388 U.S. at 403-04. We need not consider this issue at length, as the Holding Corporations do not differentiate between the formation of the arbitration clause specifically when challenging the Exchange Agreement. As the district court stated, the Holding Corporations "fail to specifically allege any misrepresentation that allegedly induced them to agree to the Arbitration Clause, other than those that relate generally to the Exchange Agreement as a whole." R & R at 22. Upon independent consideration of the Amended Complaint, we must agree.

---

arbitration clause was found, ideals of judicial efficiency and the aims of the FAA require such inquiry be made by the arbitrator rather than the court.

31

The allegations of the Amended Complaint make it clear that the Holding Corporations do not challenge the formation of the arbitration clause within the Exchange Agreement, but rather the entirety of the Agreement. For example, the Amended Complaint states that the Holding Corporations "seek a declaratory judgment declaring 'the Exchange Agreement' that was negotiated in connection with the parties' initial settlement discussions . . . to be void ab initio because the parties never reached a final, enforceable agreement . . . ." Am. Compl. ¶ 14. Although most of the remaining 149 pages of the Amended Complaint are silent regarding the nature of the Holding Corporations' challenge to the Exchange Agreement, nonetheless Count XIV of the Amended Complaint refers specifically to those allegations. For example, the Holding Corporations allege that "the Exchange Agreement and the arbitration and forum selection clauses contained therein, in particular, are unenforceable because [the Holding Corporations] were fraudulently induced to sign the Exchange Agreement and to agree to the arbitration and forum selection clauses therein." Id. ¶ 501. However, the Amended Complaint alleges no facts regarding the arbitration clause specifically, nor does it differentiate between Santander's allegedly fraudulent actions. Instead, it is silent regarding any distinction between the alleged inducements to enter the Exchange Agreement vis-à-vis the arbitration clause therein.

32

There can thus be no doubt that the Holding Corporations' challenges are not specific to the arbitration clause of the Exchange Agreement. Because Prima Paint was intended to prevent district courts from considering such broad challenges to general contracts containing arbitration clauses, Prima Paint applies here. We therefore affirm the district court's application of Prima Paint to the Holding Corporations' challenges.

## V.

Lastly, the Holding Corporations contend that, even if some of their claims are arbitrable under the Exchange Agreement because of the nexus with the losses they suffered from Madoff's fraud, the first four counts of their Amended Complaint are not. Specifically, they contend that the Exchange Agreement requires arbitration "only as to claims arising from investments in Optimal SUS and 1.3% of the Arbitrage Fund." Appllnt. Br. at 53. However, the Holding Corporation characterizes their claims under Counts I-IV as relating to Santander's "recommendations of unsuitable investments contrary to [their] stated risk of tolerance and investment objectives, not including Optimal SUS and 1.3% of Arbitrage." Id. at 54. We perceive no such distinction in the Holding Corporations' pleadings.

33

The Amended Complaint itself belies the Holding Corporations' distinction between the claims arising from Santander's negligence and others arising from Madoff's fraud. In Count I, for example, the Holding Corporations, after adopting the previous 91 pages and 314 paragraphs of allegations relating to the facts underlying their claims (many of which pertained to Madoff's fraud), allege specifically that Santander

> continu[ed] to promote and recommend that [the Holding Corporations] invest additional funds in Optimal SUS and Arbitrage after they knew or reasonably should have known that Madoff was engaged in fraudulent conduct such that any additional investments placed with Madoff through Optimal SUS and Arbitrage would further expose [the Holding Corporations] to the fraud . . . .

Am. Compl. ¶ 322(h).  Nor is Count I alone in alleging the pertinence of Madoff's fraud to the Holding Corporations' losses.[18] Count III also adopts 314 paragraphs of allegations and alleges the identical language as cited above in Count 1. Id. ¶340(h). So does Count IV. Id.  ¶350(h).

The Exchange Agreement clearly encompasses such claims. As noted above, the arbitration clause, section 6.1, states that "all controversies between the client and the bank or the bank parties arising out of or relating to this agreement or matters related thereto" must be arbitrated. The "whereas" clauses within the

---

[18] While Count II does not refer to Madoff's fraud, it is explicitly pleaded in the alternative to Count I and is therefore inherently related to the allegations contained in ¶ 322(h) of the Amended Complaint.

34

Exchange Agreement refer directly to the Optimal Strategic funds and their Madoff nexus. See, e.g., Exch. Agmnt. at 2(IV). Moreover, the release within the Exchange Agreement, found in section 3(F), provides a release of claims "whether arising out of statute, regulations, contracts, breach of fiduciary duty or tort or otherwise, and whether based on strict liability, fraud, gross negligence or negligence or otherwise . . . ." On consideration of the Holding Corporations' claims in light of those sections of the Exchange Agreement, there can be no doubt that the parties intended to encompass all such claims as the Holding Corporations now seek to state.[19]

## VI.

For the reasons noted above, we find that the district court, having correctly found that the Exchange Agreement executed by the parties was a binding contract, was bound by federal arbitration law and state principles of contract law to dismiss the Holding Corporations' challenges to the Exchange Agreement as part of a comprehensive settlement agreement. Such challenges, as made clear both by Granite Rock and Prima Paint, are properly reserved for an arbitrator. Moreover, since the entirety of the claims stated by the Amended Complaint were covered by the Exchange Agreement's arbitration clause, the district court

---

[19] This finding also comports with the "national policy" favoring arbitration. Buckeye Check Cashing, 546 U.S. at 443.

correctly dismissed the entirety of the Amended Complaint in favor of arbitration.[20]

**AFFIRMED**.

---

[20] Of course, we make no finding regarding the boundaries of the parties' comprehensive settlement agreement, or whether their agreement was limited to the Exchange Agreement. These matters are properly reserved for other entities in accordance with the Exchange Agreement.